UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MELANIE L. FOUASNON, | CASE NO. 1:21-CV-00484-DAR |
| Plaintiff, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Melanie Fouasnon filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. **§§** 1383(c) and 405(g). On March 2, 2021, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation (Non-document entry of March 2, 2021) and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry of May 20, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

## PROCEDURAL BACKGROUND

Ms. Fouasnon filed for DIB and SSI on January 10, 2019, alleging a disability onset date of January 1, 2016. (Tr. 97, 127, 236, 240). The claims were denied initially and on reconsideration.

(Tr. 96-123, 126-57). She then requested a hearing before an Administrative Law Judge. (Tr. 189-90). Ms. Fouasnon (represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on May 19, 2020. (Tr. 33-72).

On May 29, 2020, the ALJ issued a written decision finding Ms. Fouasnon not disabled. (Tr. 12-28). The Appeals Council denied Ms. Fouasnon's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Ms. Fouasnon timely filed this action on March 2, 2021. (ECF #1).

FACTUAL BACKGROUND

I.   PERSONAL AND VOCATIONAL EVIDENCE

Ms. Fouasnon was 50 years old at the time of her alleged onset date, and under the regulations is defined as an individual closely approaching advanced age. (Tr. 27). Ms. Fouasnon completed high school. (Tr. 27, 265). In the past, she has been employed as a gym manager and a personal trainer. (Tr. 26).

II.   RELEVANT MEDICAL EVIDENCE

Ms. Fouasnon is diagnosed with chronic post-traumatic stress disorder (PTSD) and major depressive disorder. (Tr. 360). She also has an avoidant/restrictive food intake disorder (anorexia nervosa), agoraphobia with panic disorder, and "other specified personality disorder (with histrionic features)." (Tr. 371, 412).

**Far West Center.** In a mental health progress note from March 12, 2018, Ms. Fouasnon reported suffering from depression, PTSD and agoraphobia for the past three years and could not stabilize. (Tr. 360, 388). She reported weakness due to eating only once per day; she stated she does not think she deserves food. (Tr. 388). Ms. Fouasnon reported a significant history of trauma

2

and sexual abuse, starting from when she was two years old. (Tr. 388, 391). Ms. Fouasnon stated she believed her anorexia was related to "deep issues" and she would not eat in an attempt to harm herself. (Tr. 389-90). She reported never taking psychiatric medications, but had seen a counselor and attended groups at Portage Path prior to moving to Cuyahoga County. (Tr. 360, 389).

Candace Clark, LPCC-S, recommended that Ms. Fouasnon receive counseling services for her PTSD symptoms, a psychiatric assessment to determine her need for medication, and a community psychiatric supportive treatment (CPST)[1] assessment to determine her need for those services. (Tr. 361, 394). Ms. Clark also recommended that if trauma therapy does not help, then Ms. Fouasnon should seek outside help for her eating disorder. (Tr. 391).

On March 27, 2018, Ms. Fouasnon reported having eaten nothing for three days and struggling with PTSD symptoms. (Tr. 363). Ms. Clark noted that Ms. Fouasnon talked at a very fast-paced rate for the entire session. (*Id.*). Further, Ms. Fouasnon's thoughts were very disorganized during the session, making interventions difficult. (*Id.*). Ms. Clark indicated Ms. Fouasnon had made minimal progress. (*Id.*).

---

[1]     The Ohio Administrative Code describes CPST as

provid[ing] an array of services delivered by community based, mobile individuals or multidisciplinary teams of professionals and trained others. Services address the individualized mental health needs of the client. They are directed towards adults, children, adolescents and families and will vary with respect to hours, type and intensity of services, depending on the changing needs of each individual. The purpose/intent of CPST services is to provide specific, measurable, and individualized services to each person served. CPST services should be focused on the individual's ability to succeed in the community; to identify and access needed services; and to show improvement in school, work and family and integration and contributions within the community.

Ohio Admin. Code § 5122-29-17(A).

Also on March 27, 2018, Ms. Fouasnon had a nursing visit. (Tr. 364-66). Ms. Fouasnon was 5' 6" tall and weighed 134 pounds. (Tr. 364). During the examination, Ms. Fouasnon reported a forty-year history of anorexia using starvation methods and over-exercising. (Tr. 365). She experienced a breakdown twenty years previously, featuring anorexia in which she "nearly died," resulting in a six-month intensive hospitalization. (Tr. 365). Ms. Fouasnon stated she experiences suicidal thoughts at least once a week; she has a plan of jumping off a bridge or crashing her car on a bridge. (*Id.*). Ms. Fouasnon stated she needed to have a psychiatrist to sign her disability papers. (*Id.*). She was uninterested in pharmacological management, explaining she "d[id] not want something that could tempt her into a possible suicide attempt." (*Id.*). However, she was open to small doses of anti-anxiety medications. (*Id.*). Progress made was fair, and Lisa Danevich, RN, did not receive direct answers to her questions; instead, Ms. Fouasnon often referred back to her trauma history. (*Id.*). She was restless, rocking back and forth, fidgeting, and made only poor-to-fair eye contact. (*Id.*).

On May 21, 2018, Ms. Fouasnon presented with an upset mood and depressed affect. (Tr. 367). Ms. Fouasnon had not scheduled therapy sessions for a few months; Ms. Clark addressed barriers to attending treatment during the session. (*Id.*). Ms. Clark noted minimal progress during this session. (*Id.*).

On May 29, 2018, Ms. Fouasnon presented with high anxiety, again talked through the entire session at a fast pace, and was tearful. (Tr. 370). She had attended a funeral for her nephew and experienced trauma symptoms as a result of his recent death. (*Id.*). Ms. Clark again noted minimal progress and poor insight at this session. (*Id.*).

4

On June 15, 2018, Ms. Fouasnon was upset, had an anxious mood and affect, talked fast paced, and was tearful; she reported she was not coping well. (Tr. 372). Ms. Clark noted that Ms. Fouasnon's case was complicated in part due to the need to manage maladaptive communication. (*Id.*). Ms. Clark planned to reach out to Ms. Fouasnon's CPST worker. (*Id.*).

On June 20, 2018, Ms. Fouasnon had a telephone session with Ms. Clark, because she had been hospitalized earlier that week for abdominal pain. (Tr. 374). Her affect was down, she was tearful, and had fair insight. (*Id.*). Ms. Fouasnon reported having nightmares; she agreed to journal them for future discussion with her counselor. (*Id.*). Ms. Clark noted no progress. (Tr. 375-76).

On June 26, 2018, Ms. Fouasnon again was tearful, spoke rapidly throughout the session, and was anxious. (Tr. 374, 377). Ms. Fouasnon was meeting with her CPST worker that day. (Tr. 374). Ms. Fouasnon reported she was not coping well. (*Id.*). Her insight was poor. (Tr. 377). However, she reported wishing to address her trauma. (*Id.*). Minimal progress was made. (Tr. 378).

On July 11, 2018, Ms. Fouasnon reported feeling better, although she still presented with an anxious affect, spoke rapidly, and was "all over the place." (Tr. 379). She had poor insight. (*Id.*). Ms. Clark noted minimal progress made and high anxiety, although Ms. Fouasnon reported she was coping well. (Tr. 380).

On July 25, 2018, Ms. Fouasnon presented with high anxiety, spoke rapidly for the entire session, and had difficulty slowing down her thoughts. (Tr. 382). Ms. Fouasnon acknowledged she needed more intensive work and asked about trauma groups in the area. (*Id.*). Ms. Fouasnon reported coping well. (*Id.*). Ms. Clark indicated minimal progress was made. (*Id.*).

On July 30, 2018, Ms. Fouasnon presented with an anxious effect, tangential thinking, and poor insight. (Tr. 383). Ms. Fouasnon reported to her counselor that she has many unresolved

issues and was fearful to address them due to the pain it would cause. (Tr. 383-84). She again spoke rapidly for the entire session. (Tr. 384). Ms. Clark noted it was difficult for her to address Ms. Fouasnon's issues as she continued to talk through the entire session. (*Id.*).

On that day, Ms. Fouasnon met with Grace Herwig, APRN, for a psychiatric evaluation. (Tr. 385). Ms. Fouasnon indicated she had been denied disability by an ALJ, was seeking to reapply, and was led to believe she could receive a note from a psychiatrist stating she cannot work. (*Id.*). Nurse Herwig informed Ms. Fouasnon she could not meet with the psychiatrist except in extreme circumstances, and in no event would the psychiatrist attest that she is totally disabled and unable to work, as that is the purpose of a social security hearing. (*Id.*). Ms. Fouasnon indicated she would follow up for rescheduling with a psychiatric evaluation if needed. (*Id.*).

On September 4, October 18, and November 21, 2018, Ms. Fouasnon presented with an anxious and depressed mood, anxious affect, and poor insight. (Tr. 386, 395-400). She attended these sessions by phone, stating she was out of town on vacation with family or had other travel and so could not meet in person. (*Id.*). Minimal progress was made. (*Id.*).

On January 22, 2019, Ms. Fouasnon again reported by phone with an anxious, depressed mood, and an anxious and manic affect, with poor insight. (Tr. 403). She reported an increase in anxiety and depression. (*Id.*). She had not been eating much and had lost a lot of weight; she was currently living with her daughter due to decompensation. (*Id.*). Ms. Fouasnon was engaged and cooperative, and was receptive to attending programming for her eating disorder. (*Id.*). Ms. Clark referred Ms. Fouasnon to Portage Path for dialectical behavioral therapy intensive treatment and/or the eating disorder clinic in Beechwood. (*Id.*). Ms. Clark kept Ms. Fouasnon's case open

until the referral was complete. (Tr. 403-04). Ms. Clark also encouraged Ms. Fouasnon to go to the emergency room if she further decompensated. (Tr. 403).

On March 6, 2019, Ms. Fouasnon began seeing Stephanie Stachnik[2] and attended an in-person counseling session. (Tr. 419). At this visit, Ms. Fouasnon reported she was not eating, though it was not related to a suicide attempt or intent to harm herself. (*Id.*). Ms. Fouasnon reported traumatic memories, trouble eating, grief, and depression; she also reported occasional splits in personality. (Tr. 420). Minimal progress was made due to Ms. Fouasnon's defensiveness when coping skills were suggested to her. (*Id.*).

On March 19, 2019, Ms. Fouasnon presented with a "terrified" mood, normal affect, and fair insight. (Tr. 422). She reported not eating and having lost four pounds. (Tr. 423). Notes indicate Ms. Fouasnon had minimal ability and struggled to manage her mental health symptoms. (*Id.*). Ms. Stachnik provided information on The Emily Program for eating disorders. (*Id.*). Ms. Fouasnon agreed to call The Emily Program, but expressed hesitation at beginning the program. (*Id.*).

On April 17, 2019, Ms. Fouasnon reported she had last eaten three days previously, stating she feels "gross and dirty" when she eats and not eating helps her manage her emotional pain. (Tr. 426). Minimal progress was made due to Ms. Fouasnon's lack of coping skills. (*Id.*). Ms. Fouasnon had not called The Emily Program since the last session; she agreed to call The Emily Program and to call the Nord Center and Oakview for more information on their intensive treatment programs. (*Id.*).

---

[2] Ms. Stachnik's licensure is not apparent from the transcript, but I note  her progress notes are cosigned by Candace Clark, LPCC-S. (*See, e.g.*, Tr. 420).

On May 7, 2019, Ms. Fouasnon reported she had been eating a little each day. (Tr. 428). She had not called the Nord Center or Oakview due to vacation plans, but agreed to call when she returned. (Tr. 428-29). Ms. Fouasnon made moderate progress at this session and was better able to use positive coping skills and set healthy boundaries. (Tr. 428-29).

On June 12, 2019, Ms. Fouasnon identified symptoms of PTSD, depression, anxiety, and anorexia. (Tr. 430-31). She had not called the referrals made for the intensive outpatient and eating disorder programs but again agreed to make those calls. (*Id.*). Minimal progress was made due to lack of coping skills, not eating, and lack of follow up on the referrals. (Tr. 431).

On July 10, 2019, Ms. Fouasnon attended her counseling appointment by phone. (Tr. 432). She reported isolating in her hotel room during a conference due to weakness in her body from not eating. (*Id.*). Ms. Fouasnon reported eating "almost nothing," leading to weakness and her brain shutting down. (*Id.*). Minimal progress was made. (Tr. 433).

**Portage Path Behavioral Health.** On February 2, 2019, Ms. Fouasnon underwent an initial intake clinical assessment at Portage Path Behavioral Health by Kevin Fasig, LPCC-S, LICDC. (Tr. 436-42). Ms. Fouasnon reported an increase in trauma-related symptoms in recent months and difficulty coping; symptoms included anorexic behaviors, daily sadness, crying spells, isolation from others, anhedonia, nervousness, and poor concentration. (Tr. 436-37). Ms. Fouasnon indicated that the worsening of her trauma symptoms had caused a recent refusal to eat. (*Id.*).

Notes indicate she was potentially underweight, although no physical examination was performed. (Tr. 439). Ms. Fouasnon had an appropriate affect and euthymic mood; her behavior was cooperative during the examination. (*Id.*). However, her insight and judgment were fair and

her thoughts logical but tangential. (Tr. 439-40). Mr. Fasig recommended admission to Portage Path Behavioral Health; he made service referrals and scheduled appointments for individual therapy and partial hospitalization. (Tr. 440).

Ms. Fouasnon was admitted to the Pathways program, with a start date of February 18, 2019, but did not show to the appointment and did not respond to staff attempts to contact her and reschedule. (Tr. 444-51). She also did not attend her individual therapy appointments. (Tr. 444). On March 5, 2019, Ms. Fouasnon was discharged from Portage Path Behavioral Health's care with the ability to reenter the program in the future if she requests services. (*Id.*).

Ms. Fouasnon returned for treatment at Portage Path on April 3, 2020, appearing via telehealth due to the COVID-19 pandemic. (Tr. 471-79). She requested to have treatment at Pathways once services restarted; until then, she requested individual therapy with a counselor. (Tr. 471). Ms. Fouasnon reported problems with depression, mood swings, and past trauma; she had experienced a recent increase in trauma-related symptoms and difficulties coping. (Tr. 472). Ms. Fouasnon reported her flashbacks were beginning to escalate. (Tr. 477). She had lost weight over the past few months – possibly ten or more pounds. (*Id.*). Ms. Fouasnon was referred to the Pathways program because the severity of her symptoms was such that the success of traditional outpatient individual or group treatment was doubtful. (Tr. 476). Until the Pathways program reopened, Ms. Fouasnon was to be seen by Carrie Price, LPCC-S, the Pathways group leader. (*Id.*).

From April 6 to 28, 2020 (the last date available in the medical record), Ms. Fouasnon attended twice weekly telehealth counseling sessions with Ms. Price as part of the partial hospitalization program. (Tr. 480-510). At the initial appointment on April 6, and throughout most sessions, Ms. Price indicated Ms. Fouasnon's overall functioning was rated at a four: "Average

(client is able to function just as effectively as most people)." (Tr. 481, 484, 499, 503 506). On April 6, Ms. Fouasnon reported she had not eaten anything solid for about a month; the previous Christmas she had lost about a pound per day. (Tr. 482). Ms. Fouasnon again declined treatment through the Emily Program. (*Id.*). Ms. Fouasnon reported problems with driving, stating she has not driven in a car for years. (*Id.*). Ms. Price recommended evidence-based trauma resources for Ms. Fouasnon, including a book for them to review together during sessions. (Tr. 483-84).

At sessions on April 10, 14, 17, 21, and 28, Ms. Fouasnon was again tangential and spoke through the entire session; at times Ms. Price found it difficult to interrupt to provide observations. (Tr. 496, 498-99, 502, 506, 510). Ms. Fouasnon's mood was often anxious (Tr. 483, 501) or depressed (Tr. 495); periodically, she had a euthymic mood. (Tr. 495, 498). Ms. Fouasnon's insight and judgment were rated as "good" at many sessions (Tr. 495, 498, 501, 509), but were often otherwise "fair." (Tr. 483, 504-05, 508).

At the final session on April 28, Ms. Fouasnon's overall functioning was rated at a three: "Somewhat poor (client is able to effectively function for sustained periods between clinical contacts)." (Tr. 510).

**Innovative Counseling.** On August 5, 2019, Ms. Fouasnon underwent an assessment at Innovative Counseling conducted by Joyous Williams, LPC, ATR-BC.[3] (Tr. 465-67). Ms. Fouasnon presented with an active anorexia relapse. (Tr. 467). She did not think the Far West Center could meet her trauma-related needs. (Tr. 465). Ms. Fouasnon again declined suggestions to attend the

---

[3]    ATR-BC designates a board-certified registered art therapist. *See Board Certified Registered Art Therapist (ATR-BC), Art Therapy Credentials Board, Inc.*, http://www.atcb.org/board-certified-registered-art-therapist-atr-bc/ (last visited June 15, 2022).

Emily Program for eating disorders. (Tr. 465). She was interested in resolving her trauma history and symptoms related to her childhood abuse. (Tr. 467).

At follow-up on September 16, 2019, Ms. Fouasnon was tangential and discussed her eating disorder but was unwilling to address it in treatment. (Tr. 468). Ms. Fouasnon was distracted and provided concerns and barriers to treatment for her eating disorder. (*Id.*). However, she was more open to a higher level of care than she had been in the previous session. (*Id.*). Ms. Williams offered Ms. Fouasnon one additional session to assist her with accessing resources and obtaining referrals for more intensive treatment. (*Id.*). Ms. Fouasnon could return to Ms. Williams' care when her baseline stabilization indicated weekly therapy would be an effective level of care. (*Id.*).

At the referral appointment on September 23, 2019, Ms. Williams discussed with Ms. Fouasnon the options available for her care and referral resources. (Tr. 469). Multiple area resources were provided to Ms. Fouasnon. (Tr. 470). Ms. Fouasnon, however, was fixated on a defunct practice for treating her eating disorder and declined partial hospitalization or intensive outpatient program treatments. (*Id.*). Ms. Fouasnon was invited to reenter services in the future after the intensive outpatient psychiatric and eating disorder concerns are addressed. (*Id.*).

**Psych and Psych Services.** Ms. Fouasnon underwent an intake assessment with Diana Sanantonio, Ed.S., on January 14, 2020, after having received a referral from another specialist. (Tr. 454-64). Ms. Fouasnon was diagnosed with anorexia nervosa and PTSD, with a fair prognosis. (Tr. 457). Problems to be addressed included anorexia and trauma. (Tr. 458). Dr. Sanantonio indicated Ms. Fouasnon required individual treatment twice per month, but that she may look for

a therapist closer to home. (Tr. 459). Ms. Fouasnon did not return for treatment; a phone message indicated she may have found services closer to home. (Tr. 464).

## III.  MEDICAL OPINIONS

**Ronald Smith, Ph.D.** On April 22, 2019, Ms. Fouasnon underwent an evaluation conducted by Ronald Smith, Ph.D. (Tr. 407-13). In the evaluation, Ms. Fouasnon recounted her past trauma, flashbacks, and anorexia. (*Id.*). She endorsed frequent panic attacks where she gets so overwhelmed that she is unable to move, and render her unable to drive. (Tr. 411). Ms. Fouasnon reported eating once per week, possibly a bowl of soup or a salad; she drinks a latte daily. (Tr. 412). When discussing Ms. Fouasnon's activities of daily living, she described herself as "physically dysfunctional." (Tr. 412).

Dr. Smith provided a functional assessment of Ms. Fouasnon's abilities. (Tr. 412-13). In it, Dr. Smith opined Ms. Fouasnon would be able to understand and remember job instructions. (*Id.*). However, her ability to carry out job instructions successfully would be compromised because "she is 'physically dysfunctional,' lacking in motivation, and incapable of attacking any particular task or goal." (Tr. 413). Moreover, she will have trouble carrying out job instructions due to the physical weakness she may experience from not eating. (*Id.*). Dr. Smith also opined that Ms. Fouasnon will have trouble maintaining adequate attention and concentration, and in maintaining persistence and pace in both simple and complex tasks. (*Id.*). Regarding interpersonal work pressures, Dr. Smith opined Ms. Fouasnon will be limited in her ability to interact appropriately to supervisors and coworkers "because of the difficulty that others will have of understanding the basis or rationale for dysfunctionality." (*Id.*). She will also have trouble

responding appropriately to interpersonal work pressures. (*Id.*). However, Ms. Fouasnon appeared capable of handling funds if awarded. (*Id.*).

**State Agency Reviewers.** State agency medical consultants reviewed Ms. Fouasnon's record at the initial and reconsideration levels.

At the initial level, Karla Delcour, Ph.D., reviewed Ms. Fouasnon's records on May 8, 2019, including the results of Dr. Smith's examination. (Tr. 96-123). Dr. Delcour found Dr. Smith's examination was persuasive, because it was a recent and thorough examination and consistent with other available information. (Tr. 104, 118). Dr. Delcour found Ms. Fouasnon was "markedly limited" in her ability to interact appropriately with the general public, moderately limited in her ability to respond to criticism from supervisors, and moderately limited in her ability to get along with her coworkers. (Tr. 106, 120). As a result, Dr. Delcour opined Ms. Fouasnon would be able to perform in a work environment in which she had "infrequent contact with the general public, coworkers, and supervisors and any supervisory criticism should be presented in a positive and supportive manner." (*Id.*). Ms. Fouasnon was also moderately limited in her ability to respond appropriately to changes in the work setting. (*Id.*). Dr. Delcour opined Ms. Fouasnon could perform in an environment with infrequent changes in the work routine and with low production quotas performed at a consistent pace. (*Id.*). With these limitations incorporated into her mental residual functional capacity assessment, Ms. Fouasnon was found not disabled. (Tr. 108-09, 122-23).

Katherine Fernandez, Psy.D., reviewed Ms. Fouasnon's records at the reconsideration level on September 3, 2019. (Tr. 126-57). Dr. Fernandez found that Ms. Fouasnon was moderately limited in her ability to interact with the general public, respond appropriately to criticism from

supervisors, and get along with her coworkers. (Tr. 137, 152-53). Dr. Fernandez repeated Dr. Delcour's limitations regarding infrequent contact with the general public, coworkers, and supervisors, and that any supervisory criticism should be presented in a positive and supportive manner. (Tr. 137, 153). Dr. Fernandez also found Ms. Fouasnon moderately limited in her ability to respond appropriately to changes in the workplace, and endorsed Dr. Delcour's findings regarding infrequent changes in work routine, low production quotas, and consistent pace. (*Id.*).

Dr. Fernandez found Dr. Smith's opinion was less persuasive, because it was without substantial support and the opinion overestimated the severity of Ms. Fouasnon's limitations. (Tr. 154). Dr. Fernandez provided additional explanation that the prior ALJ's findings were not adopted, due to changes in the psychological listings, as well as the fact that Ms. Fouasnon's eating disorder diagnosis had not been assessed by the ALJ. (Tr. 137, 156). Dr. Fernandez found that Dr. Delcour's prior findings were supported by the evidence, but made minor changes for clarity and consistency. (Tr. 137). Ms. Fouasnon was found not disabled. (Tr. 140).

## IV.  OTHER RELEVANT EVIDENCE

**Pastor Richard Skoff.** Ms. Fouasnon's pastor, Richard Skoff, completed a third-party statement on April 5, 2020. (Tr. 346). In it, he described a time when Ms. Fouasnon attempted to help him with some clerical work. (*Id.*). She was only able to stay on the task for ten minutes before getting frustrated and angry. (*Id.*). Pastor Skoff described Ms. Fouasnon as having trouble concentrating and unable to stick to tasks for any length of time. (*Id.*). She is also prevented from sustaining work due to constant pain and extreme weakness. (*Id.*). Pastor Skoff stated Ms. Fouasnon is unable to eat or enjoy food, and becomes extremely tormented after eating even a small amount of food. (*Id.*).

In his forty-eight years of ministry, Pastor Skoff stated he has "helped many people with their problems, but I have not been able to help Melanie. I have never seen a case as severe as hers." (*Id.*).

**Noreen Sykes.** Noreen Sykes, Ms. Fouasnon's friend with whom she lives, also completed an undated third-party statement. (Tr. 349-50). Ms. Sykes described the times she had to assist Ms. Fouasnon move around the house because she was too weak to move herself. (Tr. 349). Ms. Sykes described Ms. Fouasnon's physical weakness from her eating disorder, and that she does not require Ms. Fouasnon do physical work in the home or pay any bills. (*Id.*). Ms. Fouasnon also gets overwhelmed easily from her severe PTSD. (*Id.*). Ms. Sykes has seen Ms. Fouasnon's rapid weight loss, which scared her "because it was like watching her die right in front of my eyes." (Tr. 350). During that episode, Ms. Fouasnon's children flew in to assist her. (*Id.*). Ms. Fouasnon had not driven for over a year due to PTSD, and she also experiences anxiety as a passenger. (*Id.*). Compared with other mentally ill people in her life, Ms. Sykes has not seen a case as severe as Ms. Fouasnon's, or someone as shut down. (*Id.*).

## V.  ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Fouasnon and VE Brian Womer, presented during the hearing before the ALJ.

Ms. Fouasnon testified that she had last worked in 2015 as a manager for a personal training studio. (Tr. 40-41). She also did personal training and weight loss consultations, although this work lessened as she became a manager at the company. (Tr. 41). She would have periods of work before her mental health issues would recur and she would stop working. (Tr. 42-43, 50). The last five years she has been unable to work because her eating disorder has been progressively

15

getting worse. (Tr. 43-44, 50). She had to stop working because she was having flashbacks of the trauma she sustained as a young child while at work, and she would "begin to split." (Tr. 61). Her flashbacks vary in frequency from twice a week to daily. (*Id.*).

Ms. Fouasnon attempted to assist her pastor in doing some clerical tasks to input taxes into the computer. (Tr. 62). She stated she could not last ten minutes at this task. (*Id.*). She could not get her brain to focus on the task and she wanted to throw the papers. (*Id.*).

Ms. Fouasnon described her condition as complex PTSD and eating disorder; she has had four breakdowns in the past, one in which she was in a closet screaming for two days, another in which she remained in the fetal position for six months and dropped to under 100 pounds. (Tr. 50-51). Ms. Fouasnon also described an inability to concentrate, tiredness, and lack of energy due to her conditions. (Tr. 51). The Christmas prior to the hearing, Ms. Fouasnon described losing a pound per day. (*Id.*).

Ms. Fouasnon has been seeing two specialists in trauma, who both told her that she required intensive outpatient or inpatient treatment. (*Id.*). But before she could access these services, the COVID-19 pandemic arrived and she was unable to obtain this type of care. (*Id.*). In lieu of inpatient treatment with Pathways at Portage Path Behavioral Health (which treats patients for PTSD and addictions), Ms. Fouasnon has been in counseling twice per week with the head of the Pathways program. (*Id.*). Ms. Fouasnon has had suicidal tendencies. (Tr. 61-62). She has been tempted to take pills in a suicide attempt before and for this reason is fearful of starting medication. (Tr. 61).

Ms. Fouasnon lives with a friend, her friend's husband, and their adult daughter. (Tr. 40, 57). Because of Ms. Fouasnon's low function, the family will sometimes come in and clean her

room for her. (Tr. 51). She has trouble getting enough energy to change her clothes or bathe herself. (Tr. 60). She has attempted to help her friend cook, but has been unable to sustain the task for more than ten minutes before shutting down. (Tr. 63). She gets overwhelmed easily and keeps to herself in her room to prevent triggers or "flipping out" on people. (Id.).

The VE then testified. The ALJ first asked the VE to assume a hypothetical individual that could work at all exertional levels, but can understand, remember, and carry out simple instructions in a routine work setting, and can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production-rate pace; the work does not require more than superficial interaction (meaning that it does not require negotiating with, instructing, persuading, or directing the work of others); and the occupation does not require interaction with the public. (Tr. 67-68). The VE testified that such an individual would not be able to perform Ms. Fouasnon's past work. (Tr. 68). However, the hypothetical individual could perform SVP 2, medium work, including as a laundry worker (DOT 361.685-018), 370,000 jobs in the national economy; warehouse worker (DOT 922.687-058), 1,100,000 jobs in the national economy; and industrial cleaner (DOT 381.687-018), 230,000 jobs in the national economy. (Tr. 68).

The second hypothetical considered an individual who would be off-task twenty percent of the time; the VE testified this hypothetical individual could not sustain entry-level unskilled work. (Tr. 68-69). Neither could an individual who would be absent two times per month on an ongoing basis sustain work. (Tr. 69).

Ms. Fouasnon's attorney asked a hypothetical of the VE, inquiring whether an individual who requires supervisory criticism that was always supportive and positive would be able to sustain

work. (Tr. 69). The VE responded that there is no guarantee that criticism is always going to be supportive and positive, and such a limitation would be work-preclusive. (Tr. 70). And it would be outside the scope of competitive work if the individual in the first hypothetical required no more than few supervisory interactions or no coworker interactions instead of superficial interactions. (*Id.*). Such a limitation would be work-preclusive because the jobs offered are not performed in isolation and are performed in proximity to coworkers. (*Id.*).

THE ALJ'S DECISION

The ALJ's decision, dated May 29, 2020, included the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2.  The claimant has not engaged in substantial gainful activity since January 1, 2016, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: PTSD, eating disorder, anxiety disorder, depressive disorder, and other specified personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She can understand, remember, and carry out simple instructions in a routine work setting. She can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production rate pace, the work does not require more than superficial interaction, meaning that it does not require negotiating with, instructing, persuading, or directing the work of others, and the occupation does not require interaction with the public.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on February 17, 1965 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.      The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18-28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if

supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work.

*Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Ms. Fouasnon presents two issues for review. She first argues that the ALJ's RFC finding is not supported by substantial evidence because no opinion in the record supports such a finding, and the record, as a whole, documents greater limitations. (Pl.'s Br., ECF #12, PageID 582). Second, she argues the ALJ erred in refusing to consider the lay evidence provided in the third-party statements from her pastor and friend. (*Id.* at PageID 582, 601-03).

The Commissioner opposes, stating that the ALJ followed the controlling regulations when discounting the medical opinions of record because they were inconsistent with the other record evidence. (Comm'r's Br., ECF #14, PageID 620). The Commissioner further argues the ALJ's failure to consider the third-party statements does not require remand, because the ALJ otherwise considered the objective record evidence relating to the issues raised in those statements. (*Id.*). For the reasons that follow, I agree with Ms. Fouasnon that her case requires remand.

## I. The ALJ's RFC finding was not supported by substantial evidence.

Ms. Fouasnon first argues the ALJ erred in his RFC finding, particularly in his evaluation of the opinion evidence in the record. (Pl.'s Br., ECF #12, PageID 596). Ms. Fouasnon argues the ALJ cited isolated treatment notes to support his lay conclusion that Ms. Fouasnon was more functional than opined by the psychologists in the record. (Pl's Br., ECF #12, PageID 598). She also argues the ALJ erred by relying on Ms. Fouasnon's own assessment of her strengths, which

22

were contrary to many treatment notes indicating she had fair-to-poor insight (and thus may be unreliable in any self-assessment of her functional abilities). (*Id.* at PageID 600).

The Commissioner responds that the ALJ's RFC determination was supported by substantial evidence because he provided a thorough and balanced review of the evidence, in accordance with regulations requiring explanations be grounded in terms of supportability and consistency. (Comm'r's Br., ECF #14, PageID 624-26). I conclude the reasoning underlying those findings appears to be based on the ALJ's lay opinion; for that reason, remand is required.

Because Ms. Fouasnon filed her application after March 27, 2017, her case is evaluated under the regulations found in 20 C.F.R. §§ 404.1520c and 416.920c. Under these regulations, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. §§ 404.1520c(b) & 416.920c(b). The regulations define a medical opinion as "a statement from a medical source about what [the claimant] can still do despite [his] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2) & 416.1513(a)(2).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *Id.* at §§ 404.1520c(a) & 416.920c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the *two* "most important

factors" of supportability[4] and consistency.[5] 20 C.F.R. §§ 404.1520c(b) & 416.920c(b). An ALJ

must explain how the ALJ considered the factors of supportability and consistency, and "may, but

[is] not required to" explain the remaining factors of relationship with the claimant, specialization,

or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. See 20 C.F.R.

§§ 404.1520c(b)(2)-(3) & 416.920c(b)(2)-(3). In the decision, the ALJ is required to say enough to

allow this Court to trace the path of reasoning in the decision. *See Stacey v. Comm'r of Soc. Sec.*, 451

F. App'x 517, 519 (6th Cir. 2011).

     The RFC is what an individual can still do despite her limitations. SSR 96-8p. It is an

administrative assessment of the extent to which an individual's impairments and related

symptoms may cause limitations or restrictions that affect her capacity to do work-related activities.

*Id.* An ALJ's RFC assessment must be based on all relevant evidence in the case record and must

include "a narrative discussion describing how the evidence supports each conclusion, citing

specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities,

observations)." *Id.* "In rendering his RFC decision, the ALJ must give some indication of the

evidence upon which he is relying, and he may not ignore evidence that does not support his

decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 744 F.

Supp. 2d at 881. But when assessing the evidence, it is well-established that ALJs may not

---

[4]    "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[5]    "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

substitute their lay interpretation of the evidence for that of trained medical professionals. *See, e.g.,*

*Meece v. Barnhart*, 192 Fed. App'x. 456, 465 (6th Cir. 2006) (collecting cases).

Here, the ALJ found Ms. Fouasnon had the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She can understand, remember, and carry out simple instructions in a routine work setting. She can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production rate pace, the work does not require more than superficial interaction, meaning that it does not require negotiating with, instructing, persuading, or directing the work of others, and the occupation does not require interaction with the public.

(Tr. 20). In support of his RFC assessment, the ALJ considered the opinions of the State agency

psychological consultants, Karla Delcour, Ph.D., and Katherine Fernandez, Psy.D., and the

consultative examiner, Ronald Smith, Ph.D. (Tr. 24-25). However, the ALJ found each of these

opinions to be "less persuasive" and declined to include their more restrictive findings into his

RFC. (*Compare* Tr. 20 *with* Tr. 24-25 *and* Tr. 106, 120, 137, 153, 412-13). For example, Drs.

Delcour and Fernandez both determined that Ms. Fouasnon would require "infrequent contact

with the general public, coworkers, and supervisors, and any supervisory criticism should be

presented in a positive and supportive manner." (Tr. 106, 120, 137, 153). The ALJ discounted

these opinions, stating,

> the record does not support a need for positive criticism and it does not contain any references to the claimant reacting poorly to bad attitudes encountered in others or the need to work alone. The record indicated the claimant presented as oriented with cooperative behavior, logical and goal-directed thought process, and no abnormal thought content. In addition, the undersigned finds this is inconsistent with evidence presented at the hearing level that indicated the claimant had a deep compassion for others and ability to help others, was very strong psychologically, and functioned as effectively as most people.

25

(Tr. 25) (internal citations omitted). The Commissioner claims this is a reasonable conclusion and is well-explained by its reference to inconsistency with the record evidence. (Comm'r's Br., ECF #14, PageID 625).

I conclude otherwise. The ALJ's reasoning in support of his RFC findings is tantamount to rendering a medical judgment. His reasoning rests on perceived flaws (such as the assumption that the need for positive criticism was based on Ms. Fouasnon's potential to react to "bad attitudes" in the workplace) rather than the conclusion of two State agency medical professionals based on their review of her record.[6] Moreover, it appears to conclude that an individual who was otherwise cooperative, logical, at times had a goal-directed thought process, or had no abnormal thought content could not require the limitations suggested by the opinions of two trained State agency psychological consultants. The ALJ does not have the medical expertise to make these judgments, and neither does this Court. It is worth remembering the admonition that "judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). This may be particularly true where an ALJ is reading the record based on personal assumptions of mental illness. *See Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011) (*citing id*).

Dr. Smith's opinion of Ms. Fouasnon's limitations included narratives such as describing Ms. Fouasnon being compromised in her ability to carry out job instructions due to lack of motivation and an incapability of attacking a particular task or goal, and having trouble carrying out job instructions due to physical weakness resulting from her anorexia. He also described her as

---

[6] I note that Ms. Fouasnon's history includes a diagnosis of agoraphobia with panic disorder, for example. (Tr. 371).

"hav[ing] trouble maintaining adequate attention and concentration as well as maintaining persistence and pace in the performance of simple or more complex tasks." (Tr. 412-13). He further opined that Ms. Fouasnon "will have difficulty dealing appropriately with supervisors and coworkers because of the difficulty that others will have of understanding the basis or rationale for dysfunctionality" and that "she will have trouble responding appropriately to interpersonal work pressures." (Tr. 413).

As to Dr. Smith's opinion, the ALJ stated:

> the undersigned finds Dr. Smith's opinion less persuasive because it is vague regarding the specific degree of limitations. Further, his opinion regarding lack of motivation and incapable of completing a particular tasks [*sic*] or goal is inconsistent with progress notes that indicated the claimant was traveling a lot and generally able to function just as effectively as most people. In addition, the undersigned finds Dr. Smith's opinion is inconsistent with his own examination. For example, the claimant provided responses direct and to the point and showed well-organized thinking. She demonstrated appropriate affective expression and was somewhat tense initially but became more relaxed, easygoing, and showed signs of a positive affect. She presented as alert, oriented, and in good contact with reality, generally performed mental status tasks, and showed fair insight and good judgment.

(Tr. 25). This excerpt also includes instances of the ALJ substituting lay interpretation for that of medical professional, such as when the ALJ cites Ms. Fouasnon's ability to travel as evidence undermining Dr. Smith's opinion that she is incapable of attacking a particular task or goal. Likewise, the ALJ's description of the purported inconsistencies[7] in Dr. Smith's opinion appears to substitute his lay understanding of Ms. Fouasnon's conduct during the examination for that of Dr. Smith's medical opinion—such as when the ALJ cites Ms. Fouasnon's eventual relaxation during

---

[7] The ALJ describes these factors as "inconsistent" but they might better be described as "unsupported," as supportability is the extent to which a medical source has articulated support for their own opinion, while consistency refers to the relationship of a medical source's opinion against the other evidence in the record. *See* 20 C.F.R. §§ 404.1520c(b) & 416.920c(b).

the examination, or her "direct answers," "appropriate affective expression," or that she "showed signs of a positive affect" as proof of the inconsistency of Dr. Smith's opinion or that she was not as limited as opined. (*Compare* Tr. 25 *with* Tr. 410).

I note similar flaws elsewhere in the ALJ's RFC assessment when discussing Ms. Fouasnon's treatment record and Dr. Smith's evaluation. (*See* Tr. 23-24). For example, the ALJ noted "conservative mental health treatment," that Ms. Fouasnon was "taking no psychotropic medication and declined referral to a psychiatrist, although was open to this as part of her treatment plan" and that there was "no evidence of treatment for panic attacks and no evidence of inpatient psychiatric stays or repeated emergency department visits due to exacerbations of symptoms" as indications Ms. Fouasnon might not be as limited as alleged. (Tr. 23-24). Such decisions regarding types of treatment and prescribing of medications are to be made by Ms. Fouasnon's treatment providers, not  the ALJ. The record does not reflect a recommendation from a medical professional that Ms. Fouasnon required psychotropic medications, as the ALJ perhaps suggests she should receive. And the ALJ's assessment of Ms. Fouasnon's treatment as "conservative" or that she did not have periods where she required inpatient treatment is not an accurate reading of the record. Rather, Ms. Fouasnon's record demonstrates that counseling treatment alone was insufficient and referrals for more intensive treatment were made. (Tr. 404, 444, 469, 476). By the time of the hearing, Ms. Fouasnon was enrolled in Pathways, a partial hospitalization program. (Tr. 480-510). It is true that the COVID-19 pandemic necessitated that these services be provided via telehealth (and therefore were not "inpatient" services), but it does not necessarily follow that treatment was "conservative" in nature.

This flawed discussion of the evidence does not meet the substantial evidence standard, particularly where the evidence is filtered through the substitution of the ALJ's lay opinion rather than the opinions of the medical sources. For these reasons, I recommend remand.

## II.     The ALJ erred by not considering the third-party statements.

Ms. Fouasnon next argues the ALJ erred by not considering the third-party statements provided by her pastor and friend. (Pl.'s Br., ECF #12, PageID 601-03). The Commissioner counters that any error is harmless, as the ALJ otherwise considered the record evidence as to the impairments contained in these third-party statements. (Comm'r's Br., ECF # 14, PageID 626-27).

An ALJ must "consider all evidence available" in a claimant's case record. 42 U.S.C. § 423(d)(5)(B). However, the ALJ is "not required to articulate how [he] considered evidence from nonmedical sources" in the decision. 20 C.F.R. §§ 404.1520c(d) & 416.920c(d); *see also Merritt v. Comm'r of Soc. Sec.*, No. 320CV00467CRSCHL, 2022 WL 1134295, at *8 (W.D. Ky. Feb. 7, 2022), *report and recommendation adopted sub nom. Merritt v. Kijakazi*, No. 3:20-CV-467-CRS, 2022 WL 822164 (W.D. Ky. Mar. 18, 2022). An ALJ does not commit reversible error where the third-party evidence not articulated is cumulative of the other evidence of record that the ALJ did consider and articulate. *See Beckett v. Comm'r of Soc. Sec.*, No. 117CV00303TWPSKL, 2018 WL 7254710, at *10 (E.D. Tenn. Oct. 5, 2018*), report and recommendation adopted*, No. 1:17-CV-303, 2019 WL 183830 (E.D. Tenn. Jan. 14, 2019) (collecting cases).

Here, a somewhat different situation presents. The ALJ explicitly refused to consider the evidence, stating "[p]ursuant to 20 CFR 404.1520b and 416.920b, the undersigned did not consider the laypersons opinions of the claimant's pastor and friend." (Tr. 26). The ALJ provided no further elaboration.

29

Although the ALJ did not particularize it, I presume the ALJ intended to refer to subsection (c) contained within those regulations, which states, "[b]ecause the evidence listed . . . [in] this section is inherently neither valuable nor persuasive to the issue of whether you are disabled . . . we will not provide any analysis about how we considered such evidence in our determination or decision . . . ." 20 C.F.R. §§ 404.1520b(c) & 416.920b(c). The Commissioner does not clarify the ALJ's intent, but cites *Pasco v. Commr of Soc. Sec.*, 137 F. App'x 828, 842 (6th Cir. 2005), in support of the proposition that "[t]he ALJ's failure to consider that evidence, however, does not require remand, because the ALJ otherwise provided a lengthy discussion—as shown above—of the objective evidence supporting his RFC assessment." (Comm'r's Br., ECF #14, PageID 626-27).

The references cited by the ALJ and the Commissioner are erroneous and misstate the ALJ's requirements under the regulations. *Pasco* centers not on the ALJ's failure to consider a nonmedical source letter, but on the ALJ's failure to discuss such a letter. *Pasco*, 137 F. App'x at 842 ("Pasco also claims that the ALJ erred by failing to discuss a letter written to the SSA by her mother . . . ."). The Sixth Circuit therefore found no reversible error when the ALJ did not specifically mention the letter, because the ALJ provided a lengthy discussion of the lack of objective evidence elsewhere in the decision. *Id.* Ms. Fouasnon agrees that the regulations do not require an ALJ to articulate how evidence from a nonmedical source is considered; instead, Ms. Fouasnon raises error with the ALJ's failure to consider the statements. (Pl.'s Reply Br., ECF #25, PageID 634).

The citation referenced by the ALJ supports the conclusion that the ALJ must *consider* the evidence, even if he does not *discuss* it. 20 C.F.R. §§ 404.1520b(c) & 416.920b(c). This is

30

supported by caselaw (*see Pasco, supra*) and the regulations. *See* 20 C.F.R. §§ 404.1520c(d) &

416.920c(d) (the ALJ is "not required to *articulate* how [he] *considered* evidence from nonmedical

sources." (emphasis added)).

Such an error may be harmless where "no reasonable ALJ, when fully crediting the

testimony could have reached a different disability determination." *Maloney v. Comm'r of Soc. Sec.*,

480 F. App'x 804, 810 (6th Cir. 2012). But even so, remand is required where the agency's failure

to follow its own regulations prejudices the claimant, even if a different outcome on remand is

unlikely. *Wilson*, 378 F.3d, 546.

I cannot speculate as to the effect of the third-party statements on the ultimate outcome of

Ms. Fouasnon's disability on remand. However, the regulations provide that the ALJ must at least

consider this evidence, even if he chooses not to include it in his discussion of the evidence.

Because the ALJ expressly declined to consider this evidence, contrary to the regulations that

require consideration at minimum, remand is also required on this basis.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I

recommend the District Court **REVERSE** the Commissioner's decision denying disability

insurance benefits and supplemental security income and **REMAND** this matter for proceedings

consistent with this recommendation.

Dated: June 15, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl,* 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.,* 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green,* No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard,* 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega,* 924 F.3d 868, 878-79 (6th Cir. 2019).